******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FINANCIAL CONSULTING, LLC, ET AL.
*v.* COMMISSIONER OF INSURANCE
(SC 19070)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued January 10—officially released December 30, 2014*

*Andrew J. O'Keefe*, with whom, on the brief, was *Joseph M. Busher*, *Jr.*, for the appellants (plaintiffs).

*Patrick T. Ring*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellee (defendant).

*Opinion*

ROBINSON, J. The principal issue in this appeal is whether the exhaustion doctrine precludes a party from bringing a declaratory judgment action pursuant to the Uniform Administrative Procedure Act (UAPA); see General Statutes § 4-175;[1] addressing matters that are the subject of an administrative agency's pending investigation of that party, prior to the commencement of a contested case hearing in accordance with General Statutes § 4-177.[2] The plaintiffs, Financial Consulting, LLC (Financial), Carl Reidemeister, Thomas M. Bonelli, Thomas Moore, Jr., and Sean Wallace,[3] appeal[4] from the judgment of the trial court dismissing their declaratory judgment action against the defendant, Thomas Leonardi, the Commissioner of Insurance (commissioner). On appeal, the plaintiffs claim that the trial court improperly concluded that: (1) they failed to exhaust their administrative remedies before bringing this declaratory judgment action pursuant to § 4-175, despite the fact that they had complied with that statute's precondition of requesting a declaratory ruling from the commissioner in accordance with General Statutes § 4-176;[5] and (2) they failed to establish their standing to bring this declaratory judgment action. We conclude that the trial court had subject matter jurisdiction over this declaratory judgment action because the plaintiffs complied with the precondition to § 4-175 set forth in § 4-176, and that the issuance of "second chance notices" to the plaintiffs by the Department of Insurance (department) pursuant to General Statutes (Supp. 2014) § 4-182 (c)[6] did not, in the absence of a contested case hearing instituted under § 4-177, operate to commence agency proceedings under which they would have administrative remedies to exhaust. We further agree with the plaintiffs' argument that the trial court improperly determined that they were not aggrieved parties with standing to bring this declaratory judgment action.[7] Accordingly, we reverse the judgment of the trial court.

The record reveals the following undisputed facts and procedural history.[8] The plaintiffs are insurance producers who conduct business within the state of Connecticut and are licensees of the department. In September, 2009, the Illinois Mutual Life Insurance Company (Illinois Mutual) notified the department that it was terminating the appointment of the plaintiffs as its agents, for cause arising from the plaintiffs' alleged misconduct while selling life insurance policies to military personnel. After reviewing information submitted by Illinois Mutual, the department, pursuant to its authority under General Statutes § 38a-16 (a), began to investigate the plaintiffs to determine whether they had violated any of Connecticut's insurance laws in connection with those sales. During the course of the investigation, from January, 2011, through June, 2011, the department issued "second chance" notices, pursuant

to § 4-182 (c), to each of the plaintiffs, informing them of the allegations and offering them an opportunity to show their compliance with the law in order to retain their licenses.[9] Subsequently, on September 12, 2011, Reidemeister attended a conference with the department at which he attempted to show compliance with the insurance statutes and regulations. The department's investigation remains ongoing and it continues to collect information in order to determine whether it will bring administrative charges against the plaintiffs.[10]

After the department's issuance of the § 4-182 (c) notices to the plaintiffs, but before its conference with Reidemeister, the plaintiffs petitioned the commissioner on or about July 1, 2011, pursuant to § 4-176, seeking declaratory rulings with respect to seven questions concerning the legality of their conduct in the sale of life insurance policies.[11] The plaintiffs averred that these seven questions pertained to a "determination of regulations or applicability of statutes or regulations which threatened application interferes with, or impairs, or threatens to interfere with or impair the legal rights or privileges of the plaintiffs." The department received the petition by certified mail on July 5, 2011. The commissioner subsequently took no action on the petition.

After sixty days elapsed, the plaintiffs brought this action pursuant to § 4-175, seeking a declaratory judgment resolving seven questions similar to those posed to the department in their request for a declaratory ruling.[12] The plaintiffs also sought injunctive relief should the trial court, "determine that the [department's] proposed or threatened application or interpretation of [§§ 38a-819-70 through 38a-819-75 of the Regulations of Connecticut State Agencies] and [General Statutes] § 38a-816 (8) exceeds the department's jurisdiction or authority . . . ." Subsequently, the commissioner moved to dismiss this declaratory judgment action, claiming that the trial court lacked subject matter jurisdiction because the plaintiffs had failed to: (1) exhaust their administrative remedies prior to bringing this action; and (2) plead facts sufficient to establish their standing.

The trial court granted the commissioner's motion to dismiss. With respect to exhaustion, the trial court relied on *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, 270 Conn. 778, 855 A.2d 174 (2004), and concluded that the department's investigation of the plaintiffs constituted an "agency proceeding" under the UAPA, and that the plaintiffs had available to them administrative remedies should the department ultimately take adverse action against their insurance licenses. The trial court then relied on *River Bend Associates, Inc.* v. *Water Pollution Control Authority*, 262 Conn. 84, 809 A.2d 492 (2002), and rejected the plaintiffs' claim that §§ 4-175 and 4-176 authorized them to use

the declaratory judgment procedure to bypass the department's pending administrative process. Accordingly, the trial court concluded that it lacked subject matter jurisdiction because the plaintiffs had failed to exhaust their administrative remedies. After agreeing with the commissioner's additional jurisdictional argument that the plaintiffs lacked standing to maintain this declaratory judgment action,[13] the trial court granted the motion to dismiss and rendered judgment accordingly. This appeal followed.

On appeal, the plaintiffs contend that the trial court improperly concluded that: (1) they had failed to exhaust their administrative remedies; and (2) they lacked standing to bring this declaratory judgment action. We address each claim in turn.

I

We begin with the plaintiffs' claim that the trial court improperly concluded that they had failed to exhaust their administrative remedies prior to filing this declaratory judgment action pursuant to § 4-175. Relying on *Republican Party of Connecticut* v. *Merrill*, 307 Conn. 470, 55 A.3d 251 (2012), the plaintiffs argue that the plain language of § 4-175 does not impose any exhaustion requirement beyond first seeking a declaratory ruling from the administrative agency pursuant to § 4-176, a requirement with which they had complied. The plaintiffs argue that the trial court improperly imported a nonexistent exhaustion requirement into the text of § 4-175, which contravened the purpose of that statute by requiring them to risk their licenses by "proceed[ing] in their business without knowing the answer to . . . vitally important questions" about the application of the governing statutes and regulations to their factual circumstances. The plaintiffs emphasize that they "do not have an available administrative remedy" for obtaining relief from the cloud over their business and licenses posed by the department's pending investigation. The plaintiffs further argue that the trial court improperly relied on *River Bend Associates, Inc.* v. *Water Pollution Control Authority*, supra, 262 Conn. 84, because that case is distinguishable both factually, given that the application of the regulatory scheme in the present case threatens their ability to sell insurance to military personnel, and legally, because it does not involve §§ 4-175 and 4-176.

In response, the commissioner argues that, "[w]hen an administrative agency has initiated an agency proceeding by issuing a notice to a licensee pursuant to [§ 4-182 (c)], the licensee should not be permitted to use [§ 4-175 or § 4-176] to obtain declaratory relief on the very matters that are the subject of the agency's investigation." The commissioner contends that the trial court properly determined that, under this court's decision in *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, supra, 270 Conn. 778, the

department's issuance of "second chance" notices under § 4-182 (c) during its investigation commenced an "agency proceeding," which thus required the plaintiffs to exhaust their administrative remedies in that pending proceeding before going to court. The commissioner emphasizes that the department's ongoing investigation involves the plaintiffs' past conduct, and that the resolution of that investigation will obviate the need for this declaratory judgment action insofar as the department will either: (1) find no violation and take no action against the plaintiffs, rendering any further proceedings moot; or (2) issue a disciplinary complaint against the plaintiffs seeking fines or license suspension, which would result in an administrative proceeding with a fully developed record subject to judicial review under the administrative appeal statute, General Statutes § 4-183. The commissioner further contends that the plaintiffs' reading of §§ 4-175 and 4-176, which would allow the plaintiffs to proceed with this declaratory judgment action, contravenes long settled principles of law—embodied in the primary jurisdiction doctrine described in, inter alia, *Sharkey* v. *Stamford*, 196 Conn. 253, 492 A.2d 171 (1985)—counseling against judicial interference in pending administrative proceedings, which include statutorily authorized investigations.

We agree in part with the commissioner and the plaintiffs, and conclude that the plaintiffs were required to exhaust available administrative remedies with the department prior to bringing a declaratory judgment action under § 4-175. Because, however, the department's issuance of second chance notices under § 4-182 (c) did not commence an administrative proceeding that would give the plaintiffs access to an administrative remedy—and a formal contested case hearing had not yet been instituted in accordance with § 4-177—the plaintiffs had nothing further to exhaust at the time they brought this declaratory judgment action under § 4-175. Accordingly, the trial court improperly concluded that it lacked subject matter jurisdiction on the ground that the plaintiffs had failed to exhaust their administrative remedies.

"Because the exhaustion [of administrative remedies] doctrine implicates subject matter jurisdiction, [the court] must decide as a threshold matter whether that doctrine requires dismissal of the [plaintiffs'] claim. . . . [Additionally] [b]ecause [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary. . . .

"It is a settled principle of administrative law that if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter. . . . Thus, exhaustion of remedies serves dual functions: it protects the courts from becoming unnecessarily burdened with adminis-

trative appeals and it ensures the integrity of the agency's role in administering its statutory responsibilities. . . .

"There are two ways to determine whether an administrative remedy has been exhausted. [When] a statute has established a procedure to redress a particular wrong a person must follow the specified remedy and may not institute a proceeding that might have been permissible in the absence of such a statutory procedure. . . . When, however, a statutory requirement of exhaustion is not explicit, courts are guided by [legislative] intent in determining whether application of the doctrine would be consistent with the statutory scheme. . . . Consequently, [t]he requirement of exhaustion may arise from explicit statutory language or from an administrative scheme providing for agency relief."[14] (Citations omitted; internal quotation marks omitted.) *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, 310 Conn. 797, 807–808, 82 A.3d 602 (2014).

## A

Whether the plaintiffs exhausted their administrative remedies by requesting and failing to receive a declaratory ruling from the commissioner pursuant to § 4-176, and thus were entitled to bring this action under § 4-175 despite the pendency of the department's investigation, raises a question of statutory construction. Accordingly, "we are guided by the well established principle that [i]ssues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." (Internal quotation marks omitted.) Id., 808–809.

"The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative

policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) *Commissioner of Public Safety* v. *Freedom of Information Commission*, 312 Conn. 513, 527, 93 A.3d 1142 (2014).

We begin with the relevant statutory text. Section 4-175 (a) provides: "If a provision of the general statutes, a regulation or a final decision, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff and if an agency (1) does not take an action required by subdivision (1), (2) or (3) of subsection (e) of section 4-176, within sixty days of the filing of a petition for a declaratory ruling, (2) decides not to issue a declaratory ruling under subdivision (4) or (5) of subsection (e) of said section 4-176, or (3) is deemed to have decided not to issue a declaratory ruling under subsection (i) of said section 4-176, the petitioner may seek in the Superior Court a declaratory judgment as to the validity of the regulation in question or the applicability of the provision of the general statutes, the regulation or the final decision in question to specified circumstances. The agency shall be made a party to the action."

The text of § 4-175 (a) does not require a party seeking a declaratory judgment from the trial court to do anything other than petition the agency for a declaratory ruling under § 4-176 (a), and wait the appropriate length of time under § 4-176 (e) or (i) for the agency either to act or not to act on the request for a declaratory ruling. The text of both §§ 4-175 and 4-176 are, however, silent about whether the declaratory ruling and judgment procedures are available when an agency proceeding, such as an investigation, is already pending with respect to the conduct at issue. See footnote 5 of this opinion for the relevant text of § 4-176. That "silence does not necessarily equate to ambiguity. . . . Rather, [i]n determining whether legislative silence renders a statute ambiguous, we read the statute in context to determine whether the language is susceptible to more than one reasonable interpretation." (Citations omitted; internal quotation marks omitted.) *State* v. *Ramos*, 306 Conn. 125, 136, 49 A.3d 197 (2012).

Both parties' interpretation of the text of § 4-175, read in the context of the entire statutory scheme and well established administrative law doctrines, are reasonable—particularly in reference to the "potentially conflicting public policies on which they are founded." *Commissioner of Public Safety* v. *Freedom of Information Commission*, supra, 312 Conn. 534 n.19. The plaintiffs' argument, namely, that no further exhaustion is required beyond a request for a declaratory ruling in accordance with § 4-176, is consistent with the purpose of § 4-175, which is to aid parties in obtaining the regulatory guidance necessary to resolve disputes or avoid

jeopardizing their licenses by engaging in potentially illegal activities such as, in the present case, the plaintiffs' sale of certain insurance products to military personnel. The commissioner's view of the statutory scheme, namely, that the plaintiffs were required to exhaust their administrative remedies in the context of the pending agency proceedings, which he argues commenced via the issuance of a second chance notice of the hearing under § 4-182 (c) prior to the plaintiffs' request for a declaratory ruling, is reasonable as well, given that the "doctrine of exhaustion is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions," as well as the benefit of avoiding potentially unnecessary judicial review of issues resolved at the administrative level. (Internal quotation marks omitted.) *Housing Authority* v. *Papandrea*, 222 Conn. 414, 420, 610 A.2d 637 (1992). Accordingly, we conclude that the statutory scheme is ambiguous, thus permitting resort to extratextual sources pursuant to § 1-2z.

Turning to extratextual sources, we first observe that there is no legislative history on point to illuminate how §§ 4-175 and 4-176 operate in the context of a pending investigation. We are, however, "mindful that when the legislature enacts a statute, it is presumed to be aware of the status of the law relevant to the statute. See *St. George* v. *Gordon*, 264 Conn. 538, 553, 825 A.2d 90 (2003) ('legislature is presumed to have acted with knowledge of existing statutes' . . .); *Considine* v. *Waterbury*, 279 Conn. 830, 844, 905 A.2d 70 (2006) ('legislature is presumed to be aware of prior judicial decisions involving common-law rules' . . .)." *Rweyemamu* v. *Commission on Human Rights & Opportunities*, 98 Conn. App. 646, 662, 911 A.2d 319 (2006), cert. denied, 281 Conn. 911, 916 A.2d 51, cert. denied, 552 U.S. 886, 128 S. Ct. 206, 169 L. Ed. 2d 144 (2007). Thus, we consider how §§ 4-175 and 4-176 relate to Connecticut's extensive body of case law—such as the exhaustion and primary jurisdiction doctrines—establishing the general principle that, whenever possible, courts will stay their hand with respect to addressing matters that are within the cognizance of administrative agencies. See, e.g., *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, supra, 310 Conn. 808.

Specifically, a "primary purpose of the [exhaustion] doctrine is to foster an orderly process of administrative adjudication and judicial review, offering a reviewing court the benefit of the agency's findings and conclusions. It relieves courts of the burden of prematurely deciding questions that, entrusted to an agency, may receive a satisfactory administrative disposition and avoid the need for judicial review. . . . Moreover, the exhaustion doctrine recognizes the notion, grounded in deference to [the legislature's] delegation of authority to coordinate branches of [g]overnment, that agencies,

not the courts, ought to have primary responsibility for the programs that [the legislature] has charged them to administer. . . . Therefore, exhaustion of remedies serves dual functions: it protects the courts from becoming unnecessarily burdened with administrative appeals and it ensures the integrity of the agency's role in administering its statutory responsibilities." (Citations omitted; internal quotation marks omitted.) *Stepney, LLC* v. *Fairfield*, 263 Conn. 558, 564–65, 821 A.2d 725 (2003). "Most important, a favorable outcome will render review by the court unnecessary [because] as the United States Supreme Court has noted: A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene." (Internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Water Pollution Control Authority*, supra, 262 Conn. 103.

Consistent with the prospective nature of declaratory relief generally, as compared to administrative or judicial actions that seek to remedy past wrongs, the plaintiffs' reading of the statutory scheme, providing that the sole exhaustion step under § 4-175 is a request for a declaratory ruling in accordance with § 4-176, is logical in the absence of an agency proceeding arising from the conduct at issue in the request for declaratory relief. See *Republican Party of Connecticut* v. *Merrill*, supra, 307 Conn. 484–85 ("because [a group of Republicans] sought written confirmation of the [Secretary of the State's] intended prospective application of the statute shortly before initiation of the present declaratory judgment action, the logical inference is that the plaintiff's intention was merely to obtain a statement of the [Secretary of the State's] position to support the [plaintiff's] entitlement to declaratory relief in the likely event that the [Secretary of the State] declined to change the ballot order for the 2012 election"). This is wholly consistent with the purpose of §§ 4-175 and 4-176, which exist to give regulated entities the opportunity to obtain regulatory, and subsequently judicial, guidance with respect to a statute, regulation, or final decision whose application or "threatened application . . . interferes with or impairs, or threatens to interfere with or impair, [their] legal rights or privileges . . . ." General Statutes § 4-175 (a).

The utility of that statutory procedure is, however, largely vitiated if agency proceedings have already been commenced with respect to the same conduct that forms the basis for the petition for declaratory relief. An administrative proceeding affords its subject numerous potential remedies including: (1) an agency decision concluding that the allegations are unsubstantiated and that no further action is necessary, thereby mooting a pending court case on the same point; or (2) in the event of an agency decision imposing sanctions such as fines, and license revocation or suspension, judicial

relief in an administrative appeal pursuant to § 4-183 from the final agency decision against them. See *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, supra, 310 Conn. 813 (upholding dismissal of declaratory judgment action for failure to exhaust because association was required to request declaratory ruling from Department of Consumer Protection that would have been appealable via administrative appeal, despite fact that department was aware of association's complaint and had addressed it using informal investigation and dispute resolution procedure). Thus, once an administrative proceeding has commenced, the prudential concerns underlying the exhaustion doctrine counsel against permitting parties to pursue a judicial remedy such as a declaratory judgment.

Further, although there is no Connecticut case directly on point,[15] the sister state case law revealed by our independent research supports the position of the commissioner that the declaratory judgment procedures under §§ 4-175 and 4-176 may not be used to bypass a party's obligation to exhaust its remedies in the context of a pending administrative proceeding. Particularly persuasive is the Missouri Supreme Court's decision in *Farm Bureau Town & Country Ins. Co.* v. *Angoff*, 909 S.W.2d 348 (Mo. 1995) (en banc). In *Angoff*, the state insurance director notified a property insurer that he intended to commence an administrative disciplinary action based on allegations that the insurer had illegally refused to insure properties in certain urban areas in the state. Id., 351. The insurer then brought a declaratory judgment action against the insurance director, seeking a declaration that it "not be required to provide insurance coverage to persons residing in those areas of the state which it has decided not to serve and that the director does not have jurisdiction to compel [the insurer] to write policies in such geographical areas." Id., 351–52. The insurance director moved to dismiss the declaratory judgment action as he simultaneously filed administrative charges against the insurer. Id., 351. The Missouri Supreme Court upheld the trial court's decision to dismiss the action for failure to exhaust administrative remedies, concluding that a "party threatened by agency action may invoke the court's jurisdiction to grant declaratory judgment against the agency. . . . However, once the administrative procedure is commenced by the agency, the exhaustion of administrative remedies doctrine is a compelling reason for the court to terminate the declaratory judgment action unless the action has advanced to the point that dismissal will result in undue delay or where for some other reason the administrative remedy is inadequate."[16] (Citations omitted.) Id., 354; see also, e.g., *Southern Minnesota Construction Co., Inc.* v. *Dept. of Transportation*, 637 N.W.2d 339, 344 (Minn. App. 2002) ("Before [the state Department of Transportation] instituted administrative proceedings, [the plain-

tiff] could have brought a declaratory judgment action, but once administrative proceedings had begun, [the plaintiff's] right to bring a declaratory action to arrest those proceedings was foreclosed. Once 'enforcement' begins, the proper judicial review is by certiorari of the commissioner's final determination.").[17]

B

Thus, we turn to the question of whether the department's issuance to the plaintiffs of second chance notices under § 4-182 (c) in January, 2011, and June, 2011, commenced agency proceedings, for purposes of requiring the plaintiffs to exhaust their administrative remedies within the department, rather than seek a declaratory judgment in court pursuant to § 4-175. Relying on *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, supra, 270 Conn. 798–800, the commissioner contends that the department's issuance of notices pursuant to § 4-182 (c) commenced agency proceedings in the form of a formal investigation and that, therefore, the plaintiffs were required to exhaust their administrative remedies rather than short-circuit that process by seeking declaratory relief pursuant to §§ 4-175 and 4-176. We disagree with the commissioner's reading of *Tele Tech of Connecticut Corp.*, which was adopted by the trial court, as standing for the proposition that the department's investigation of the plaintiffs itself constituted an agency proceeding once it issued the second chance notices under § 4-182 (c).

Instead, we conclude that the "investigation"[18] referred to in *Tele Tech of Connecticut Corp.* was, in fact, a license revocation proceeding, with the issue in *Tele Tech of Connecticut Corp.* being whether a letter sent by the agency to the regulated party advising it of that proceeding complied with § 4-182 (c), which is a precursor to that formal license revocation process governed by § 4-177 (b).[19] See id., 799–803; *Jones* v. *Connecticut Medical Examining Board*, 129 Conn. App. 575, 582, 19 A.3d 1264 (2011) ("notice under § 4-182 [c] is a precursor to the subsequent notice required by § 4-177 [b]"), aff'd, 309 Conn. 727, 72 A.3d 1034 (2013); see also *Jones* v. *Connecticut Medical Examining Board*, supra, 582–83 ("Section 4-182 [c] requires an agency to give a licensee, *prior to the institution of agency proceedings*, written notice of conduct warranting the revocation of its license and an opportunity to show compliance with all of the legal requirements for the retention of the license. . . . By contrast, § 4-177 requires an agency to give the licensee notice of a formal revocation proceeding . . . . Specifically, § 4-177 [b] requires that notice of a contested hearing include the following: [1] A statement of the time, place, and nature of the hearing; [2] a statement of the legal authority and jurisdiction under which the hearing is to be held; [3] a reference to the particular sections of the statutes and regulations involved; and [4] a short

and plain statement of the matters asserted. As [the Appellate Court has] held, notice of the formal revocation hearings, after institution of the agency proceedings, must comply with § 4-177, not § 4-182 [c]." [Citations omitted; emphasis altered; internal quotation marks omitted.]). Thus, we conclude that, in the present context, no agency proceeding affecting the plaintiffs' licenses is instituted until the department commences a contested case proceeding in accordance with § 38a-8-60 (a) of the Regulations of the Connecticut State Agencies,[20] which implements § 4-177 (b) for licensure matters within its jurisdiction.

In the present case, the department has not yet instituted formal license revocation proceedings, and neither the parties' briefs, nor our independent research, indicates that the department is under any statutory or regulatory obligation to do so within a time certain following the issuance of the second chance notices under § 4-182 (c). Thus, we agree with the plaintiffs that the cloud occasioned by the department's investigation of their past conduct remains over their business,[21] and they have to date been deprived of the opportunity to obtain regulatory guidance with respect to the legality of that conduct in future business endeavors.[22] We conclude, therefore, that the trial court improperly dismissed this declaratory judgment action on the ground that the plaintiffs had failed to exhaust their administrative remedies.[23]

II

Because it provides an independent basis for affirming the judgment of the trial court, we must address the plaintiffs' claim that the trial court improperly concluded that it lacked jurisdiction because the plaintiffs lacked standing. Noting the well established presumption in favor of jurisdiction, the plaintiffs rely heavily on *Bysiewicz* v. *DiNardo*, 298 Conn. 748, 6 A.3d 726 (2010), and contend that the allegations and other filings in this case adequately establish their standing to bring this declaratory judgment action because the department's application of the relevant statutes and regulations had a "dramatic and direct impact" on their livelihood from the sale of life insurance products. In response, the department relies primarily on this court's decision in *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, 218 Conn. 335, 589 A.2d 356 (1991), for the proposition that declaratory judgment actions brought under § 4-175 are subject to the same standing and aggrievement requirements as administrative appeals brought under § 4-183. The department then argues that the plaintiffs failed to establish their standing by pleading adequately either classical aggrievement or statutory aggrievement, contending that the provisions of the UAPA do not establish statutory aggrievement, and that the plaintiffs are not classically aggrieved because their allegations are con-

clusory and hypothetical. Although we agree with the commissioner that the UAPA is merely procedural and does not render the plaintiffs statutorily aggrieved, we nevertheless conclude that the plaintiffs' complaint and supporting affidavits adequately establish their standing to bring this declaratory judgment action.

Standing to bring a declaratory judgment action under § 4-175 is consistent with the aggrievement necessary to bring an administrative appeal under § 4-183, and requires the plaintiff to "demonstrate a legal interest in the subject matter [of a controversy] that can be distinguished from the interest of the general public . . . ." (Internal quotation marks omitted.) Id., 345. Thus, declaratory judgment actions brought under § 4-175 are subject to the same standing criteria as those brought under the more general declaratory judgment provisions, namely, General Statutes § 52-29 and Practice Book § 17-55. See id., 346–47. Thus, we note that "[i]t is a basic principle of our law . . . that the plaintiffs must have standing in order for a court to have jurisdiction to render a declaratory judgment. . . . Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . [Because] [s]tanding requires no more than a colorable claim of injury . . . a [party] ordinarily establishes . . . standing by allegations of injury [that he or she has suffered or is likely to suffer]. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Put differently, an action for a declaratory judgment, valuable as it has become in modern practice, is not a procedural panacea for use on all occasions. . . . In providing statutory authority for courts to grant declaratory relief, the legislature did not intend to broaden their function so as to include issues which would not be such as could be determined by the courts in ordinary actions. . . . The declaratory judgment procedure consequently may be employed only to resolve a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement. . . . A party pursuing declaratory relief must therefore demonstrate, as in ordinary actions, a justiciable right in the controversy sought to be resolved, that is, contract, property or personal rights . . . as such will be affected by the [court's] decision . . . . A party without a justiciable right in the matter sought to be adjudicated lacks standing to raise the matter in a declaratory judgment action. . . .

"Thus, [s]tanding is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected. . . .

"Finally, it is well settled that [i]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . It is well established that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged. . . . Because a determination regarding the trial court's subject matter jurisdiction raises a question of law, our review is plenary." (Citations omitted; internal quotation marks omitted.) *Travelers Casualty & Surety Co. of America* v. *Netherlands Ins. Co.*, 312 Conn. 714, 727–29, 95 A.3d 1031 (2014); see also *Bysiewicz* v. *DiNardo*, supra, 298 Conn. 758–59; *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, supra, 218 Conn. 347–48.

"Jurisdiction pursuant to § 4-175, which specifically provides for a declaratory judgment under the [UAPA] depends on whether the plaintiffs' rights or privileges have been threatened or impaired. . . . Standing is not conferred upon a plaintiff merely by virtue of the fact that the complaint recites the provisions of the statute under which it is brought. . . . Rather, a complaint brought pursuant to § 4-175 must set forth facts to support an inference that a provision of the general statutes, a regulation or a final decision, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff." (Citations omitted; internal quotation marks omitted.) *Emerick* v. *Commissioner of Public Health*, 147 Conn. App. 292, 296–97, 81 A.3d 1217 (2013), cert. denied, 311 Conn. 936, 88 A.3d 551 (2014); see also *Stefanoni* v. *Dept. of Economic & Community Development*, 142 Conn. App. 300, 319, 70 A.3d 61, cert. denied, 309 Conn. 907, 68 A.3d 661 (2013).

Because the UAPA does not, by itself, render the plaintiffs statutorily aggrieved for standing purposes, we must determine whether they are classically aggrieved. Viewing the complaint in light of the undis-

puted facts contained in the affidavits submitted by both parties in connection with the commissioner's motion to dismiss; see, e.g., *Conboy* v. *State*, 292 Conn. 642, 651–52, 974 A.2d 669 (2009); we conclude that the plaintiffs have established their standing to bring this action. Beyond general allegations reflecting the language of § 4-175, the plaintiffs averred specifically in the complaint that the "statutes and regulations subject to the petition for declaratory ruling directly relate to the plaintiffs' business practices and the sale of insurance products, and thus they have a direct interest in the subject matter of the requested declaratory judgment." The plaintiffs also pleaded that the department's compliance division "has stated that it intends to enforce the subject statutes and regulations against the plaintiffs in such a fashion that such applications threaten to interfere with or impair the plaintiffs' legal rights or privileges as insurance sales producers and small businessmen."

The other filings in connection with the complaint and the motion to dismiss further support the plaintiffs' standing.[24] Antonio Caporale, the department's in-house attorney, submitted an affidavit in support of the commissioner's motion to dismiss acknowledging that the questions presented in the plaintiffs' declaratory ruling petition, and subsequent complaint, "related to the events already under investigation by [the] department," thus demonstrating that the plaintiffs possess a very personal interest in the subject matter of the present action that is not hypothetical.[25] Reidemeister averred in his affidavit in opposition to the motion to dismiss that the department's position with respect to "how it intends to apply the regulations or statutes, which are the subject of the declaratory judgment action . . . may put me and my coworkers out of business." Additionally, Reidemeister averred that an "interpretation of the regulations which may restrict or prohibit the sale of life insurance products to military service members will directly affect my ability and the ability of my coworkers to continue making a living as we have done for the past [twenty-seven] years." Compare, e.g., *Bysiewicz* v. *DiNardo*, supra, 298 Conn. 760 (attorney general candidate's "declared intention to run for the office of attorney general and her particular interest in avoiding the great effort and expense of running for that office if her qualifications to serve in that office could be successfully challenged upon her election are sufficient to confer standing on her to bring this [declaratory judgment] action"), with *Emerick* v. *Commissioner of Public Health*, supra, 147 Conn. App. 298–99 (upholding dismissal of § 4-175 declaratory judgment action challenging town's removal of diving board at municipal pool, at behest of Department of Public Health, because "the plaintiff has failed to allege facts that demonstrate that he has an interest either in the now removed diving board or in the interpretation of

the regulations concerning diving boards that is distinguishable from the interest of the general public"). Accordingly, we conclude that the trial court improperly determined that the plaintiffs lacked standing to bring this declaratory judgment action.[26]

The judgment is reversed and the case is remanded to the trial court for further proceedings according to law.

In this opinion the other justices concurred.

[1] General Statutes § 4-175 (a) provides: "If a provision of the general statutes, a regulation or a final decision, or its threatened application, interferes with or impairs, or threatens to interfere with or impair, the legal rights or privileges of the plaintiff and if an agency (1) does not take an action required by subdivision (1), (2) or (3) of subsection (e) of section 4-176, within sixty days of the filing of a petition for a declaratory ruling, (2) decides not to issue a declaratory ruling under subdivision (4) or (5) of subsection (e) of said section 4-176, or (3) is deemed to have decided not to issue a declaratory ruling under subsection (i) of said section 4-176, the petitioner may seek in the Superior Court a declaratory judgment as to the validity of the regulation in question or the applicability of the provision of the general statutes, the regulation or the final decision in question to specified circumstances. The agency shall be made a party to the action."

[2] General Statutes § 4-177 provides in relevant part: "(a) In a contested case, all parties shall be afforded an opportunity for hearing after reasonable notice.

"(b) The notice shall be in writing and shall include: (1) A statement of the time, place, and nature of the hearing; (2) a statement of the legal authority and jurisdiction under which the hearing is to be held; (3) a reference to the particular sections of the statutes and regulations involved; and (4) a short and plain statement of the matters asserted. If the agency or party is unable to state the matters in detail at the time the notice is served, the initial notice may be limited to a statement of the issues involved. Thereafter, upon application, a more definite and detailed statement shall be furnished. . . ."

[3] Reidemeister is the principal owner, operator and manager of Financial. Bonelli, Moore, and Wallace are employees of Financial. Each of these individuals is licensed to sell insurance in the state of Connecticut.

[4] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] General Statutes § 4-176 provides in relevant part: "(a) Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency. . . .

"(e) Within sixty days after receipt of a petition for a declaratory ruling, an agency in writing shall: (1) Issue a ruling declaring the validity of a regulation or the applicability of the provision of the general statutes, the regulation, or the final decision in question to the specified circumstances, (2) order the matter set for specified proceedings, (3) agree to issue a declaratory ruling by a specified date, (4) decide not to issue a declaratory ruling and initiate regulation-making proceedings, under section 4-168, on the subject, or (5) decide not to issue a declaratory ruling, stating the reasons for its action. . . .

"(h) A declaratory ruling shall be effective when personally delivered or mailed or on such later date specified by the agency in the ruling, shall have the same status and binding effect as an order issued in a contested case and shall be a final decision for purposes of appeal in accordance with the provisions of section 4-183. A declaratory ruling shall contain the names of all parties to the proceeding, the particular facts on which it is based and the reasons for its conclusion.

"(i) If an agency does not issue a declaratory ruling within one hundred eighty days after the filing of a petition therefor, or within such longer period as may be agreed by the parties, the agency shall be deemed to have decided not to issue such ruling. . . ."

[6] General Statutes (Supp. 2014) § 4-182 (c) provides: "No revocation, suspension, annulment or withdrawal of any license is lawful unless, prior to the institution of agency proceedings, the agency gave notice by mail to the licensee of facts or conduct which warrant the intended action and the

specific provisions of the general statutes or of regulations adopted by the agency that authorize such intended action, and the licensee was given an opportunity to show compliance with all lawful requirements for the retention of the license. If the agency finds that public health, safety or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined."

We note that § 4-182 (c) was amended by No. 13-279, § 3, of the 2013 Public Acts, which made certain changes to the statute that are not relevant to this appeal. In the interest of simplicity, we refer to the 2014 supplement of the statute.

[7] We disagree with the commissioner's proffered alternative ground for affirmance, which is a jurisdictional attack on each of the questions posed by the plaintiffs in their complaint seeking declaratory relief. See footnote 26 of this opinion.

[8] In setting forth the undisputed facts and procedural history underlying this appeal, we, like the trial court, consider the plaintiffs' complaint and affidavits filed pursuant to Practice Book § 10-31 (a), which were executed by Antonio Caporale, an attorney employed by the department, and Reidemeister. See, e.g., *Conboy* v. *State*, 292 Conn. 642, 651–52, 974 A.2d 669 (2009).

[9] In explaining § 4-182 (c), we have stated that "the 'opportunity to show compliance' provision represents a 'second chance' doctrine, which allows a licensee the opportunity to 'put its house in lawful order before more formal agency proceedings are undertaken.' " *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, 270 Conn. 778, 802, 855 A.2d 174 (2004).

[10] Antonio Caporale, the department's in-house attorney; see footnote 8 of this opinion; indicated in writing that, as of August 11, 2011, no charges had been filed, meaning that the plaintiffs had "no necessity, and no right to raise," a defense to any potential violations.

[11] The plaintiffs sought, inter alia, declaratory rulings resolving the following questions, and provided the commissioner with explanations of their position with respect to the merits of those questions: (1) Does the department "have jurisdiction or authority to enforce or expand a [United States] Navy 'policy,' directed at naval personnel, concerning activities conducted on naval installations, by naval personnel, to wit: a '[seven]-day cooling-off period' prior to submitting an allotment form for processing by [Defense Financing and Accounting Services]?"

(2) "May insurance producers sell supplemental life insurance products (which contain no 'side funds' as defined by regulation and contain no 'war exclusions') to members of the military service, who [are eighteen] years of age or older, married or unmarried who are with or without dependents or substantial assets?"

(3) "Do [§§ 38a-819-70 through 38a-819-75 of the Regulations of Connecticut State Agencies] prohibit the use of the 'MyPay' web-based system by a military service member, for the purpose of processing certain discretionary pay transactions or providing updates to personal information data elements without using paper forms?"

(4) "Do the words 'submitting, processing or assisting in the submission or processing' as set forth in [§ 38a-819-75 (c) (1) of the Regulations of Connecticut State Agencies] refer to the 'allotment form or similar devise' or do [such words] refer to all other aspect[s] of the allotment system in addition to the 'allotment form or similar devise?' " (Emphasis omitted.)

(5) "When [§§ 38a-819-70 through 38a-819-75 of the Regulations of Connecticut State Agencies] refer to an 'allotment form' does that reference mean an official, numbered [allotment] form, prepared by the [United States Navy] or other armed services departments?"

(6) "May the [department] take disciplinary action against an insurance producer under [§ 38a-819-74 (c) (1) (2) (3) or (4) of the Regulations of Connecticut State Agencies] where the insurance producer never 'received' any funds from a service member for the payment of premiums from a depository institution with which the service member has no formal banking relationship?"

(7) "With regard to [§ 38a-819-74 (c) (2) (3) (4) of the Regulations of Connecticut State Agencies]: May an insurer [as defined by § 38a-819-73 (5) of the Regulations of Connecticut State Agencies] knowingly receive funds from a service member for the payment of premiums from a depository institution with which the service member has no formal banking relationship?"

[12] The plaintiffs asked the trial court to issue a declaratory judgment

resolving the following seven issues: (1) Does the department "have jurisdiction or authority to enforce or expand a [United States] Navy 'policy' directed at naval personnel, concerning activities conducted on naval installations, by naval personnel, to wit: a '[seven]-day cooling-off period' prior to submitting an allotment form for processing by [Defense Financing and Accounting Services]; and if so, under what statute or regulation is such jurisdiction or authority granted to the [department]?"

(2) "Does [General Statutes] § 38a-816 (8) authorize the [department] to prohibit the sale of life insurance products to members of the United States Military . . . for the reason that 'whole life and universal life products are not ideal instruments for investment or savings, possible violation of § 38a-816 (8)'; or to discipline insurance producers for having sold life insurance products to members of the United States Military for such stated reason; and would such an unpublished or unnoticed application of . . . § 38a-816 (8) be in violation of [General Statutes] § 4-168 (a)?"

(3) "Do [§§ 38a-819-70 through 38a-819-75 of the Regulations of Connecticut State Agencies] prohibit the use of the 'MyPay' web-based system by a military service member, for the purpose of processing certain discretionary pay transactions or providing updates to personal information data elements without using paper forms; and if not, does the [department] have jurisdiction or authority to prohibit such use, or to discipline insurance producers if the military service members utilize such system?"

(4) "Do the words 'submitting, processing or assisting in the submission or processing' as set forth in [§ 38a-819-75 (c) (1) of the Regulations of Connecticut State Agencies] refer to the 'allotment form or similar devise' or do such words refer to all other aspects of the allotment system in addition to the 'allotment form or similar devise?' "

(5) "When [§§ 38a-819-70 through 38a-819-75 of the Regulations of Connecticut State Agencies] refer to an 'allotment form' does that reference mean an official, numbered . . . allotment form, prepared by the [United States Navy] or other armed services department, or does it refer to any piece of paper which might be called a 'form?' "

(6) "May the [department] take disciplinary action against an insurance producer under [§ 38a-819-74 (c) (1) (2) (3) or (4) of the Regulations of Connecticut State Agencies] where the insurance producer never 'received' any funds from a service member for the payment of premiums from a depository institution with which the service member has no formal banking relationship?"

(7) "With regard to [§ 38a-819-74 (c) (2) (3) (4) of the Regulations of Connecticut State Agencies]: may an insurer [as defined by § 38a-819-73 (5) of the Regulations of Connecticut State Agencies] knowingly receive funds from a service member for the payment of premiums from a depository institution with which the service member has no formal banking relationship?" (Emphasis omitted.)

[13] Specifically, the trial court relied on, inter alia, this court's decision in *Connecticut Business & Industry Assn., Inc.* v. *Commission on Hospitals & Health Care*, 218 Conn. 335, 589 A.2d 356 (1991), for the proposition that declaratory judgment actions brought under § 4-175 are subject to the same standing and aggrievement requirements as administrative appeals brought under § 4-183. The trial court then held that § 4-175 is merely a procedural mechanism that does not, by itself, provide a basis for statutory aggrievement, thereby requiring the plaintiffs to establish classical aggrievement. The trial court concluded that the facts pleaded in the plaintiffs' complaint and averred in Reidemeister's affidavit were insufficient to establish that the plaintiffs were classically aggrieved, because the department had not yet taken action restricting or otherwise jeopardizing their insurance licenses, meaning that the court could not provide them with any relief, and the plaintiffs had not pleaded specific facts that would move their request for a declaratory ruling beyond an impermissible advisory opinion. Finally, the trial court rejected the plaintiffs' request that it exercise primary jurisdiction over this declaratory judgment action, and relieve them from the need to appeal later from the commissioner's decision or indecision.

[14] We further note that, in deciding "a jurisdictional question raised by a pretrial motion to dismiss, [a court] must consider the allegations of the complaint in their most favorable light. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . The motion to dismiss . . . admits all facts which are well pleaded, invokes the existing record and must be decided upon that alone. . . . In undertaking this review, we are mindful of the well established notion that, in determining whether a court has subject

matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Internal quotation marks omitted.) *MacDermid, Inc.* v. *Leonetti*, 310 Conn. 616, 626, 79 A.3d 60 (2013); see also, e.g., *Columbia Air Services, Inc.* v. *Dept. of Transportation*, 293 Conn. 342, 347–48, 977 A.2d 636 (2009) (court applies plenary review to jurisdictional determination founded on complaint supplemented by affidavits establishing undisputed facts).

[15] We note that *Republican Party of Connecticut* v. *Merrill*, supra, 307 Conn. 470, does not support the plaintiffs' position that they should be permitted to use the declaratory ruling and judgment procedures provided by §§ 4-175 and 4-176 to avoid their obligations to exhaust the administrative remedies available to them. The plaintiffs accurately cite *Republican Party of Connecticut* for the proposition that a party exhausts its administrative remedies, thus entitling it to proceed, as appropriate, with a declaratory judgment action under § 4-175 or an administrative appeal under § 4-183, by first petitioning an agency for a declaratory ruling pursuant to § 4-176 (a). Id., 477–78. Nevertheless, *Republican Party of Connecticut* is not dispositive here because that case did not involve a declaratory judgment action filed during a pending agency investigation that was the precursor of license revocation proceedings. Accordingly, we had no occasion to consider the question of first impression at issue in the present appeal in the factually and procedurally distinct context of *Republican Party of Connecticut*.

Similarly, we disagree with the plaintiffs' criticism of the trial court's reliance on our decision in *River Bend Associates, Inc.* v. *Water Pollution Control Authority*, supra, 262 Conn. 84, in rejecting their claim that they "are entitled to expedite or bypass the formal process by seeking a declaratory ruling from the agency, or a declaratory judgment [in] court, which would address the same issues as the anticipated license proceeding." In *River Bend Associates, Inc.*, this court declined to reach the merits of whether a local water pollution control authority had correctly denied a builder's application to connect to its sewer system because the applicant had not exhausted the available administrative remedy of an appeal from the authority's denial to the Commissioner of Environmental Protection. Id., 101–102. The court concluded that "our case law makes clear that court rules, such as Practice Book § 17-55 (3), and broad statutory grants of jurisdiction, such as [General Statutes] § 52-29, are not intended to circumvent the well established principles of exhaustion." Id., 106; see also id. ("[t]o bypass the requirement of exhaustion and confer upon the courts subject matter jurisdiction where there otherwise would be no jurisdiction, a statute must exist that expresses the legislature's intent to bypass exhaustion requirements").

The plaintiffs' argument that *River Bend Associates, Inc.* is distinguishable because it did not concern §§ 4-176 or 4-175 is undermined by our case law, in particular *Republican Party of Connecticut*, which strongly suggests that declaratory judgment actions under § 4-175 are legally indistinguishable for exhaustion purposes from actions brought pursuant to § 52-29, the general declaratory judgment statute. See *Republican Party of Connecticut* v. *Merrill*, supra, 307 Conn. 484–85 (treating declaratory judgment action challenging ruling of Secretary of State as functional equivalent to administrative appeal from that ruling brought pursuant to § 4-183, and citing *Wilson* v. *Kelley*, 224 Conn. 110, 617 A.2d 433 [1992], declaratory judgment action brought under § 52-29, in describing nature of action).

[16] In emphasizing the pendency of the administrative proceedings, the Missouri Supreme Court in *Farm Bureau Town & Country Ins. Co.* v. *Angoff*, supra, 909 S.W.2d 354, distinguished its state intermediate appellate court's decision in *Group Health Plan, Inc.* v. *State Board of Registration for the Healing Arts*, 787 S.W.2d 745, 748–49 (Mo. App. 1990), which had held that, with no administrative action pending, a state court had subject matter jurisdiction over a declaratory action filed by physicians, nurses, pharmacists, and a health maintenance organization seeking a declaration that their actions allowing nurses to complete presigned prescriptions were consistent with law, and that the state medical board's threatened action would deprive them of equal protection. In *Group Health Plan, Inc.*, the court noted that there were no administrative remedies to be exhausted by the plaintiffs because no charges had been filed, meaning that there was no decision by an administrative agency to be heard or appealed, and concluded that there were no extant statutory or administrative provisions that would have allowed the plaintiffs to initiate an action within the administrative agency. See id.

[17] The other sister state cases that we have located are consistent with the Missouri Supreme Court's decision in *Farm Bureau Town & Country*

*Ins. Co.* v. *Angoff*, supra, 909 S.W.2d 348. Accord *Thomas* v. *Board of Dentistry*, 197 Ga. App. 589, 590, 398 S.E.2d 730 (1990) (a dentist is not required to exhaust administrative remedies before bringing a declaratory judgment action challenging the agency's position that the performance of certain procedures constituted the unlicensed practice of medicine because, in dismissing the administrative proceedings against him, the board warned the dentist that the continued performance of those procedures would constitute grounds for administrative and criminal prosecution, meaning that "the only way for the appellant to challenge the board's position was to continue performing the procedures, thereby risking criminal prosecution for the felony offense of practicing medicine without a license and/or the initiation of administrative proceedings to revoke his license to practice dentistry. We do not believe this option can fairly be categorized as an available administrative remedy."); *Orr* v. *Clyburn*, 277 S.C. 536, 541–42, 290 S.E.2d 804 (1982) (The court dismissed a declaratory judgment action challenging the Human Rights Commission's "preliminary administrative discretion to begin this investigation" because it "would afford opportunity for constant delays in the course of administrative proceedings and would render orderly administrative procedure impossible. Moreover, it would bring to the courts an avalanche of preliminary questions many of which would have become moot in the ordinary course of the administrative process.").

[18] We acknowledge that our opinion in *Tele Tech of Connecticut Corp.* contains language supportive of the proposition that an agency investigation is an administrative "proceeding." In particular, our conclusion that the Department of Public Utility Control "*instituted the proceedings* against Tele Tech of Connecticut Corporation (Tele Tech) when it issued the . . . letter to Tele Tech informing it of its *initiation of the new investigation.*" (Emphasis added.) *Tele Tech of Connecticut Corp.* v. *Dept. of Public Utility Control*, supra, 270 Conn. 799; see also id., 784 n.6 (reproducing content of letter). That language must, however, be viewed in the factual context of that case, wherein the term "investigation" is more properly understood to mean a license revocation proceeding conducted in accordance with § 4-177. Specifically, the principal issue in *Tele Tech of Connecticut Corp.* was whether the letter sent by the Department of Public Utility Control to Tele Tech, a provider of coin operated telephone service, the content of which "instituted" license revocation "proceedings" as a consequence for Tele Tech's failure to pay a previously imposed fine, complied with § 4-182 (c). See id., 795; see also footnote 6 of this opinion for the text of § 4-182 (c). This issue required us to determine the meaning of the undefined term "proceedings" under § 4-182 (c), in order to ascertain whether Tele Tech had received timely notice of the facts and conduct at issue, and a "second chance" opportunity to show compliance. We rejected arguments by the Department of Public Utility Control and the Office of Consumer Counsel that, "for purposes of § 4-182 (c), the department initiated proceedings *at the time of* the [administrative] hearing or when the [Department of Public Utility Control] rendered its final decision . . . ." (Emphasis added.) Id., 799. Accordingly, this court stated that we did "not understand why a warning letter with notice of the problems that might lead to the revocation of Tele Tech's certificate of public convenience and necessity and an opportunity to show compliance or to cure those problems that have resulted in noncompliance could not be sent *prior to the commencement of formal revocation proceedings.*" (Emphasis added.) Id., 799–800. Indeed, our decision in *Tele Tech of Connecticut Corp.* emphasized the distinction between formal revocation hearings and the second chance process, concluding that the second chance process under "§ 4-182 (c) does not mandate a hearing," in contrast to the subsequent formal revocation proceeding under § 4-177. Id., 811–12.

We then concluded that the Department of Public Utility Control's letter did not comply with § 4-182 (c) because it "did not provide, prior to the institution of these proceedings, 'notice . . . of [the] facts or conduct' deemed to be improper and 'an opportunity to show compliance with all lawful requirements for the retention of the license.' " Id., 800; see also id., 801 (observing that letter "merely advised Tele Tech that the [Department of Public Utility Control] had initiated an investigation into whether it should revoke Tele Tech's certificate of public convenience and necessity, informed Tele Tech of certain departmental procedural practices and indicated that it had designated Tele Tech as a party to the proceeding without reference to the basis underlying the initiation of the proceeding"). We further observed that this letter was inconsistent with the purpose of the second chance doctrine embodied in § 4-182 (c), "which allows a licensee the opportunity

to put its house in lawful order before more formal agency proceedings are undertaken." (Internal quotation marks omitted.) Id., 802; see also id., 803 (noting testimony that Tele Tech's owner would have taken advantage of "second chance" and averted license revocation proceedings by paying previously imposed fine in installments). Despite this procedural lapse, however, we upheld the Department of Public Utility Control's decision to revoke Tele Tech telephone operator's license, concluding that, on the factual record in the case, its substantial rights had not been prejudiced by the violation of § 4-182 (c). See id., 814–15.

[19] For the relevant text of § 4-177, see footnote 2 of this opinion.

[20] Section 38a-8-60 (a) of the Regulations of Connecticut State Agencies provides: "All enforcement proceedings instituted by the Commissioner for the revocation or suspension of any license or imposition of a fine, or both, shall be initiated by serving on each respondent a complaint which shall specify in reasonable detail the conduct alleged to constitute a violation of any regulation or statutory provision which the commissioner has jurisdiction to enforce and contain the information required by section 38a-8-32 of the Regulations of Connecticut State Agencies and section 4-177 of the Connecticut General Statutes. In addition, the complaint shall include a notice that the respondent's failure to file an answer in accordance with section 38a-8-61 of the Regulations of Connecticut State Agencies shall allow the commissioner or the presiding officer to treat as admitted the allegations in the complaint and issue a decision by default against the respondent, pursuant to section 38a-8-62 of the Regulations of Connecticut State Agencies."

[21] The commissioner relies on, inter alia, *Greater Bridgeport Transit District* v. *Commission on Human Rights & Opportunities*, 211 Conn. 129, 131, 557 A.2d 925 (1989), for the proposition that "we have recognized the delay and disruption in the administrative process that would result from judicial interference with statutorily authorized administrative investigations intended to determine whether there is a factual basis for the initiation of formal proceedings." See also id., 132–33 (dismissing action seeking injunctive relief for failure to exhaust administrative remedies, despite fact that action was grounded in claim that plaintiff was statutorily exempt from agency regulation); see also *Commission on Human Rights & Opportunities* v. *Archdiocesan School Office*, 202 Conn. 601, 606, 522 A.2d 781 ("it is improper to make a determination of the substantive applicability of the statute to a particular case before completion of an investigation expressly authorized to be conducted prior to the institution of a proceeding against a person who may have violated the underlying statute"), appeal dismissed, 484 U.S. 805, 108 S. Ct. 51, 98 L. Ed. 2d 15 (1987). In our view, these cases are distinguishable because, in contrast to the relatively informal second chance process that is a precursor to license revocation proceedings, they involve formal agency proceedings in the form of interrogatories that the Commission on Human Rights and Opportunities is authorized to issue under General Statutes § 46a-54 (11), subject to judicial enforcement under General Statutes § 46a-88.

[22] The legislature, of course, remains free to amend the statutory scheme to clarify, as a matter of public policy, when licensed individuals or entities may seek declaratory relief in matters that relate to pending investigations. Cf. *Keeter* v. *Texas Dept. of Agriculture*, 844 S.W.2d 901, 902 (Tex. App. 1996) (The court noted a division among commentators about whether a state declaratory judgment statute may be used to "[attack] a final order in a contested case," and observed that, although the statute did not contain an exhaustion requirement, it did provide that it "may not 'be used to delay or stay a hearing after notice of hearing has been given if a suspension, revocation, or cancellation of a license . . . is at issue before the agency.' " On the basis of these facts, the court concluded that: "other types of agency action may be stayed by [an action under the state declaratory judgment statute] before a final order or an exhaustion of remedies.").

[23] An issue potentially implicated by the commissioner's arguments that court proceedings should not be used to interfere with pending administrative investigations is whether permitting the plaintiffs to utilize the declaratory judgment procedure, without waiting for the completion of the pending investigation, implicates the primary jurisdiction doctrine, which is triggered when courts and administrative agencies have concurrent subject matter jurisdiction over a case. See, e.g., *Waterbury* v. *Washington*, 260 Conn. 506, 574, 800 A.2d 1102 (2002). Intended to "promote proper relationships between the courts and administrative agencies charged with particular regulatory duties," the primary jurisdiction doctrine "applies where a claim is originally cognizable in the courts, and comes into play whenever enforce-

ment of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." (Internal quotation marks omitted.) Id. "[T]he rationale underlying primary jurisdiction is in substance much the same as that which supports exhaustion. . . . The doctrine of primary jurisdiction, like exhaustion, is grounded in a policy of fostering an orderly process of administrative adjudication and judicial review in which a reviewing court will have the benefit of the agency's findings and conclusions." (Citation omitted; internal quotation marks omitted.) *Sharkey* v. *Stamford*, supra, 196 Conn. 256; see also *Waterbury* v. *Washington*, supra, 573–75 (concluding that legislature intended to "supplant the exhaustion doctrine and to permit courts to hear environmental claims, even where an administrative agency is available to hear the claim," but remanding case to trial court to determine whether, consistent with doctrine of primary jurisdiction, matter concerning compliance with minimum flow standards should be remanded to Department of Environmental Protection pursuant to General Statutes § 22a-18 [b]). Whether this action should be stayed pursuant to the primary jurisdiction doctrine pending the completion of the department's investigation is a matter appropriate for consideration on remand, wherein the trial court may consider whether any factual and procedural developments in the present case warrant that action.

[24] The commissioner focuses much of his standing analysis on challenging the adequacy of the more general and conclusory allegations in the complaint with respect to establishing the plaintiffs' status as personally aggrieved parties, as distinct from members of the public generally. In considering the plaintiffs' standing, however, we are not limited to the allegations in their complaint. See, e.g., *Conboy* v. *State*, supra, 292 Conn. 651–52 (noting that trial courts may consider jurisdictional questions [1] on basis of complaint alone, [2] complaint "supplemented by undisputed facts established by affidavits submitted in support of the motion to dismiss" or "other types of undisputed evidence," and [3] after holding evidentiary hearing to resolve "critical factual disputes").

[25] We disagree with the commissioner's reliance on *ABC, LLC* v. *State Ethics Commission*, 264 Conn. 812, 826 A.2d 1077 (2003), for the proposition that a declaratory judgment is inappropriate because all of the facts at issue are hypothetical until determined in the agency proceeding. In that case, we held that the plaintiffs were not aggrieved for purposes of a declaratory judgment action under § 4-175 when they had submitted a set of "hypothetical facts" for declaratory ruling by State Ethics Commission, and disclaimed them as "accurate and comprehensive account of the plaintiffs' actual conduct," which was simultaneously the subject of an ongoing contested case hearing that had been joined with their administrative petition for a declaratory ruling under § 4-176. See id., 826–28; see also id., 827 ("If the facts presented to the commission were not 'real' for the purposes of the enforcement proceedings, then they were not 'real' for the purposes of the declaratory ruling. The law, as a general rule, does not countenance parallel realities."). In relying on *ABC, LLC*, the commissioner posits that the department "could not issue a declaratory ruling on the specified circumstances under investigation because the department has not yet concluded the proceeding or made any findings of fact, and the plaintiffs have not admitted to any of the underlying facts necessary to render a declaratory ruling or judgment."

In our view, *ABC, LLC*, is distinguishable. First, as we held in part I B of this opinion, there simply is no administrative proceeding pending in this case because the department has not yet commenced a contested case hearing against the plaintiffs. In contrast, *ABC, LLC*, involved a contested case hearing pending along with the consolidated declaratory ruling petition. Second, there is no indication anywhere in this record that the plaintiffs are seeking to establish "parallel realities" by treating the department's investigation and the declaratory petition/action as factually distinct.

[26] As an alternative ground for affirming the judgment of the trial court, the commissioner argues that subject matter jurisdiction is lacking over each of the questions posed in the complaint; see footnote 12 of this opinion; on the ground that they (1) were improper under §§ 4-175 and 4-176 "for failing to seek the validity of a regulation or the applicability of a provision of the general statutes or a regulation"; (2) "were not exhausted before the department"; (3) "failed to establish standing or aggrievement"; or (4) "impermissibly sought legal advice." Because the record is adequate for review of these pure questions of law, notwithstanding the fact that the trial

court did not rule on them, we briefly review each of these somewhat hypertechnical claims.

The commissioner first argues that first question posed in the complaint is not proper under § 4-175 or § 4-176 because it "did not address the validity of [a] regulation or the applicability of [a] provision of the general statutes or [a] regulation. Instead, [the] plaintiffs sought a judgment addressing the department's jurisdiction or authority to enforce military policy." (Internal quotation marks omitted.) We disagree. Instead, we agree with the plaintiffs' contention that the first question, which questions the source of the department's statutory jurisdiction or authority to enforce United States Navy policies, is squarely within the scope of §§ 4-175 and 4-176, given that the provision of declaratory relief is keyed to "matter[s] within the jurisdiction of the agency." General Statutes § 4-176 (a).

The commissioner next argues that the second question posed in the complaint is not the same question posed in the plaintiffs' request for a declaratory ruling and, thus, means that the plaintiffs failed to exhaust their administrative remedies by first presenting it to the department. We disagree with the commissioner's restrictive reading of the record. Read realistically, the subject matter of the second question, namely, that "whole life and universal life products are not ideal instruments for investment or savings," is encompassed in the letter from the plaintiffs' counsel requesting a declaratory ruling, despite the fact that, unlike the facts posed in the letter, the second question in the complaint is not limited to a particular class of military service members. Thus, although the questions are not exactly identical, the factual predicate for second question was sufficiently presented to the department for purposes of exhaustion.

With respect to the third question, the commissioner argues that it is improper because it "did not appear to bear any particular relation to [the] plaintiffs' rights," insofar as it questioned whether the department's regulations prohibit the use of the " 'MyPay' " web-based payment system for certain purposes. Again, read in the context of the plaintiffs' underlying petition, this question indicates that the plaintiffs' business rights are implicated because the department's regulations may be used to preclude military service members from using this web-based system to pay for their life insurance purchases.

The commissioner next argues that the fourth, fifth and sixth questions posed in the complaint are "impermissible requests for legal advice." Although these questions are drafted as broader questions of law, without specific tailoring to the plaintiffs' situation, the presumption in favor of jurisdiction, as well as our conclusion that the plaintiffs have standing to bring this declaratory judgment action, counsel against finding these questions defective at this point.

Finally, we disagree with the commissioner's argument that the plaintiffs lack standing with respect to the seventh question posed in the complaint because it pertains to the receipt of funds from service members by insurers, rather than insurance producers. Read holistically with the petition, we agree with the plaintiffs and conclude that this question affects the plaintiffs' interests because of the averment that the department is seeking to apply the regulation in question against insurance producers as well.